UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                                                          Case No.: 22-35525-cgm
    Tommy Watson,                                                              Chapter 13

                                                                                                            Hon. Judge: Cecelia G. Morris

                                 Debtor.
------------------------------------------------------------X

## OBJECTION TO DEBTOR'S REQUEST FOR LOSS MITIGATION

**TO:    THE HONORABLE CECELIA G. MORRIS,
          UNITED STATES BANKRUPTCY JUDGE**

        Katherine Heidbrink, attorney for SN Servicing Corporation ("SN") as servicer for U.S. Bank Trust National Association, as Trustee of the Bungalow Series IV Trust (the "Investor," SN and Investor, collectively, "Secured Creditor"), hereby affirms under penalty as follows:

1. I am an Associate Attorney of Friedman Vartolo LLP, attorneys for the Secured Creditor.

2. Secured Creditor holds a mortgage on the Debtor's real property located at 29 Sharon Drive, Middletown, NY 10940 (the "Property"). Secured Creditor is a secured creditor of the Debtor pursuant to a Note executed by the Debtor Tommy Watson (the "Debtor") and non-party co-debtor Nicole D. Watson (the "Co-Borrower" or "Co-Debtor") on November 6, 2006, whereby the Debtor and Co-Borrower promised to repay $228,567.67 plus interest to Century 21 (R) Mortgage (SM) (the "Original Lender"). To secure the repayment of the Note, the Debtor and Co-Borrower executed a Mortgage in favor of Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee of record for the Original Lender, encumbering the Property (the "Mortgage," Note and Mortgage, collectively, the "Loan"),

recorded on February 15, 2007, in Mort/Bk: 12366, Page: 1669 in the Orange County Clerk's Office. The Loan was later duly assigned to Secured Creditor.

3. The Debtor's proposed Chapter 13 Plan (ECF Doc. No. 12, filed on September 17, 2022, the "Plan") is dependent on loss mitigation for success, and contains an incorrect monthly mortgage payment to prior servicer Seterus, Inc. ("Seterus").

4. This Objection is submitted in response to the Debtor's second Loss Mitigation Request filed on October 8, 2022 (ECF Doc. Nos. 24 & 25, collectively, the "Request").

5. As a preliminary matter, Secured Creditor notes that the Debtor previously filed a request for loss mitigation with prior servicer Seterus, which serviced the Loan prior to January 31, 2020 (ECF Doc. No. 13). That request for loss mitigation and the related Order (ECF Doc. No. 18) resulted in loss mitigation being terminated by Order entered on October 11, 2022 (ECF Doc. No. 26). The Debtor then re-filed the Request with the proper creditor, Secured Creditor. Secured Creditor now objects substantively to the new Request for the follow reasons.

6. Substantively, Secured Creditor respectfully objects to loss mitigation on the grounds of duplicativeness, mootness, and futility.

7. The Debtor and Co-Debtor previously received a permanent loan modification effective August 1, 2013, with a step interest rate starting at 2.000% and culminating at 3.875% fixed (the "Permanent Modification"). A copy of said Permanent Modification is attached as **Exhibit A.**

8. After the Permanent Modification, the Debtor again defaulted on the Loan. Secured Creditor's Loan is pre-petition due for May 1, 2014, over 8 years ago.

9. Currently, there is a total debt on the Loan of approximately $470,567.30 as of September 30, 2022, and pre-petition arrears totaling approximately $251,809.35. The current monthly payment on the Loan is $2,274.27, which is comprised of $1,537.26 in principal & interest and $737.01 in escrow. The current interest rate on the Loan is 3.875%. No post-petition mortgage payments have been received to date.

10. The instant bankruptcy case is the third filing affecting the Loan.

11. On May 1, 2017 the Debtor filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code under case 17-35728-cgm, thus staying the setting of a foreclosure sale (the "First Case").

12. At the time the First Case was commenced, the Loan was serviced by Seterus. During the First Case, the Debtor filed a Request for Loss Mitigation concerning the Loan on June 9, 2017 (ECF Doc. No. 13), which Seterus did not oppose. An Order Granting Loss Mitigation was entered by the Court on June 28, 2017 (ECF Doc. No. 18). However, the Debtor never provided Seterus with an initial financial package for review (ECF Doc. No. 27). As such, loss mitigation was terminated at the hearing held on September 12, 2022, and on September 28, 2017, the Order Terminating Loss Mitigation was entered by the Court (ECF Doc. No. 28). Formal S.D.N.Y. Loss Mitigation supervised by this Court was pending in the First Case for 92 days.

13. Thereafter, the Trustee filed a Motion to Dismiss the First Case (ECF Doc. No. 32) due to the Debtor's failure to make plan payments or propose a plan that was not dependent on loss mitigation for feasibility. In the First Case, the Debtor's proposed plan made payments of $250 per month, and the Debtor was 5 payments in arrears when the Motion to Dismiss

was filed. This Court granted the Trustee's Motion to Dismiss the First Case by Order on November 20, 2017 (ECF Doc. No. 36).

14. The foreclosure action then proceeded, and a foreclosure sale was scheduled for December 13, 2018. However, on December 12, 2018, one day prior to a scheduled foreclosure sale and on the "eve of sale," the Debtor filed the second voluntary petition for relief under Chapter 13 of the Bankruptcy Code under Case No. 18-37058-cgm, thus forcing the cancellation of the scheduled foreclosure sale (the "Second Case").

15. During the Second Case, the Debtor again proposed a plan that was dependent upon formal S.D.N.Y. Loss Mitigation for success, with monthly plan payments of $200 (ECF Doc. No. 11). An Order Granting Loss Mitigation was entered by the Court on January 23, 2019 (ECF Doc. No. 15). On May 6, 2019, as part of the formal S.D.N.Y. Loss Mitigation, Nationstar Mortgage LLC d/b/a Mr. Cooper, Secured Creditor's predecessor-in-interest, approved the Debtor for a Flex Modification Trial Plan concerning the Loan, with three trial payments of $2,108.37 each due on the first of each month from June 1, 2019 to August 1, 2019 (ECF Doc. No. 37, the "Trial Modification"). However, rather than accept the Trial Modification, the Debtor elected to surrender the Property (ECF Doc. No. 47). On September 27, 2019, the Order Terminating Loss Mitigation due to no agreement reached was entered by the Court (ECF Doc. No. 50). Formal S.D.N.Y. Loss Mitigation was pending in the Second Case for 247 days.

16. The Trustee filed a Motion to Dismiss the Second Case (ECF Doc. No. 49) on September 25, 2019, due to the Debtor's failure to make plan payments, failure to provide documents, and failure to propose a feasible plan not dependent upon loss mitigation. While the Second Case was pending, the Loan was subsequently transferred to the Secured Creditor as

evidenced by a Transfer of Claim filed on January 31, 2020 (ECF Doc. No. 58). An Order dismissing the Second Case on the Trustee's Motion was entered by the Court on February 5, 2020 (ECF Doc. No. 59).

17. Following the dismissal of the Second Case, all foreclosure actions in New York State were stayed due to the Covid-19 Pandemic. Once the moratorium on the Covid-19 Pandemic was lifted in the Foreclosure, the Secured Creditor made an application to the New York State Supreme Court, for the purpose of scheduling a foreclosure sale.

18. The foreclosure action then proceeded, and a foreclosure sale was scheduled for August 24, 2022. However, on August 23, 2022, one day prior to a scheduled foreclosure sale and on the "eve of sale," the Debtor filed the third and instant voluntary petition for relief under Chapter 13 of the Bankruptcy Code under Case No. 22-35525-cgm, thus forcing the cancellation of the scheduled foreclosure sale.

19. In this third and instant case, the Debtor's Ch. 13 Plan (ECF Doc. No. 12, filed September, 2022) provides for 60 monthly plan payments of either $200 or $300 per month, for total of $16,800 to be paid through the plan. As of the petition date in the third and instant case, the appropriate pre-petition arrears on the Loan are $251,809.35, which makes the proposed plan infeasible and wholly dependent upon loss mitigation for success.

20. Secured Creditor respectfully objects to the Debtor's loss mitigation Request in the third and instant case as follows.

21. First, Secured Creditor notes the extensive bankruptcy and loss mitigation history concerning the Loan, including the recent rejection of the Trial Modification and the 339 days of total loss mitigation supervised by this Court.

22. Second, Secured Creditor notes that the multiple bankruptcy filings give rise to a reasonable inference of Secured Creditor's entitlement to in rem relief, pursuant to 11 U.S.C. § 362(d)(4). Secured Creditor has filed a Motion for In Rem Relief from the automatic stay for the same reason, and said motion is returnable November 15, 2022 (ECF Doc. Nos. 22 & 23, filed October 8, 2022). General Order #M-451 Sec. VII(A) requires that loss mitigation parties negotiate in good faith, which may be impeded by the permissible inference of bad faith that arises with multiple bankruptcy filings.

23. Third, even if this Court were to order loss mitigation over Secured Creditor's objection, the Debtor's own Schedules in this case do not show that a loan modification would be affordable.

24. In the Second Case, the Trial Modification featured a total monthly payment of $2,108.37, inclusive of escrow. In this case, the Debtor's Schedule I shows a gross monthly household income of $9,391.55 and net monthly household income of $5,206.24. The Debtor's Schedule J in the third and instant case shows a total of $2,843.43 in non-mortgage expenses. As such, only $2,362.81 per month is available to pay toward a mortgage payment.

25. The unmodified total monthly mortgage payment is approximately $2,274.27, inclusive of $737.01 in monthly escrow.

26. If[1] Secured Creditor were to reamortize all arrears and set the interest-bearing principal balance at $470,567.30, and if Secured Creditor were to increase the interest rate from 3.875% to 4.5% and extend the loan term to 480 months, a monthly principal & interest

---

[1] This paragraph is for hypothetical and illustration purposes only, and is not a loan modification offer or consent to loss mitigation. The terms in this paragraph do not represent any actual modification program or offer available on the Loan.

payment of $2,115.50 would result. When combined with the $737.01 in monthly escrow, a total payment of $2,852.51 would result. When combined with the figures in the Debtor's Schedules, a net monthly loss of ($489.70) would result, which is not affordable.

27. Secured Creditor also notes that the Investor has recently reviewed this Loan and confirmed that no loss mitigation options are available due to the three recent bankruptcy filings. Furthermore, the existing interest rate of 3.875% fixed is significantly below market.

28. Finally, Secured Creditor notes that the Debtor's ex-spouse and the Co-Debtor would need to participate in loss mitigation review and sign off on any permanent modification that might be offered, as she is also a party to the Loan.

29. For all the above reasons, Secured Creditor cannot provide an affordable modification in this case, and further loss mitigation would be futile.

**WHEREFORE,** Secured Creditor respectfully requests that this Court deny the Request, in its entirety, as requested herein; and further relief that this Court deems proper.

Dated: October 24, 2022
Fresh Meadows, New York

Respectfully submitted,
FRIEDMAN VARTOLO LLP

By: /s/ Katherine Heidbrink
KATHERINE HEIDBRINK, ESQ.
1325 Franklin Avenue, Suite 160
Garden City, New York 11530
Telephone: 212-471-5100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:                                                                                  Case No.: 22-35525-cgm
    Tommy Watson,                                                        Chapter 13

                                                                           Hon. Judge: Cecelia G. Morris
                                Debtor.
-----------------------------------------------------------X

I, Katherine Heidbrink, an attorney duly admitted to practice law before the District Courts of the State of New York, respectfully certify that I am not a party to this action, am over 18 years of age and reside in the State of New York. On October 24, 2022, I caused to be served the foregoing Opposition by mailing the same in a sealed envelope, with postage paid thereon, in an official depository of the United States Post Office, addressed to the last known address of the addressee(s) as indicated below:

Tommy Watson
29 Sharon Drive
Middletown, NY 10941
***Debtor***

Nicole D. Watson
29 Sharon Drive
Middletown, NY 10941
***Co-Borrower***

Brian C. Fetzko
Fetzko Law Offices, P.C.
12 Evergreen Drive
Suite 102
Middletown, NY 1094
***Debtor's Attorney***

Krista M. Preuss
Chapter 13 Standing Trustee
399 Knollwood Road
White Plains, NY 10603
***Trustee***

United States Trustee

Office of the United States Trustee
11A Clinton Ave.
Room 620
Albany, NY 12207
**U.S. Trustee**

AIS Portfolio Services, LLC
Attn: BMW Bank of North America
4515 N. Santa Fe Ave
Oklahoma City, OK 73118

Warren Greher
Greher Law Offices, P. C.
1161 Little Britain Road
Suite B
New Windsor, NY 12553
**Former Counsel to Co-Borrower**               /s/ Katherine Heidbrink
                                                KATHERINE HEIDBRINK, ESQ.

# EXHIBIT A

Recording Requested By/Return To:
JPMORGAN CHASE BANK, N.A.
CHASE RECORDS CENTER
RE: COLLATERAL TRAILING
DOCUMENTS
PO BOX 8000
MONROE, LA 71203

This Instrument Prepared By:
JPMORGAN CHASE BANK, N.A.
**    3415 VISION DRIVE
COLUMBUS, OH 43219-6009

――――――――――――――― [Space Above This Line For Recording Data] ―――――――――――――――

# LOAN MODIFICATION AGREEMENT
(Providing for Step Interest Rate)

This modification adds the amount of $90,245.91 to the current principal balance of $223,315.76, and represents capitalized interest, fees, expenses, and other amounts due under the terms of the original Mortgage/Deed of Trust/Trust Deed. The new unpaid principal balance of the loan, as modified, is $313,561.67. The original principal balance of the loan on which mortgage/recording taxes were previously paid was $228,567.00.

Current principal balance now due and owing: $223,315.76
Taxable accrued interest: $90,245.91

Loan Number ▮▮▮▮▮▮▮▮

    This Loan Modification Agreement ("Agreement"), will become effective on: 1ST day of AUGUST, 2013,
*     between NICOLE D WATSON AND TOMMY WATSON ("Borrower") and
**    JPMORGAN CHASE BANK, N.A. ("Lender") , amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed ("Security Instrument"), and Timely Payment Rewards Rider, if any, dated NOVEMBER 06, 2006 and recorded in reference numbers of documents modified: RECORDED FEBRUARY 15, 2007 BOOK 12366 PAGE 1669 and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real property described in the Security Instrument and defined therein as the "Property", located at

*     29 SHARON DR, MIDDLETOWN, NEW YORK 10940
(Property Address)

the real property described being set forth as follows:

LEGAL DESCRIPTION:
SECTION 102 BLOCK 1 LOT 15

JPMC MODIFIED LOAN MODIFICATION AGREEMENT – Single Family – Fannie Mae  UNIFORM INSTRUMENT    ver.
06_12_2013_11_01_56     ▮▮▮▮▮▮▮▮     1/01 (rev. 01/09)     (page 1 of 10 pages)

COUNTY OF ORANGE AND STATE OF NEW YORK

THE LAND IS SITUATED IN THE STATE OF NEW YORK, COUNTY OF ORANGE, TOWN OF WALLKILL, AND DESCRIBED AS FOLLOWS: ALL THAT CERTAIN PLOT, PIECE, OR PARCEL OF LAND SITUATE IN THE TOWN OF WALLKILL, COUNTY OF ORANGE, STATE OF NEW YORK, SAID LANDS BEING SHOWN AS LOT NO. 16 ON A MAP ENTITLED "SUBDIVISION SHERMAN ESTATES, TOWN OF WALLKILL, ORANGE COUNTY, NEW YORK," DATED FEBRUARY 3, 1995, LAST REVISED AUGUST 22, 1995 AND FILED IN THE ORANGE COUNTY CLERK'S OFFICE ON SEPTEMBER 30, 1996 AS MAP NO. 203-96, SAID LANDS BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS: BEGINNING AT A CONCRETE MONUMENT LYING ON THE EASTERLY LINE OF SHARON DRIVE, SAID POINT BEING THE NORTHWESTERLY CORNER OF LANDS HEREIN DESCRIBED AND THE SOUTHWESTERLY CORNER OF LOT NO. 15 AS SHOWN ON THE PREVIOUSLY MENTIONED MAP; THENCE RUNNING ALONG THE SOUTHERLY LINE OF SAID LOT NO. 15 BEING THE NORTHERLY LINE OF LANDS HEREIN DESCRIBED (1) NORTH 60 DEGREES 26'00" EAST, AS PER FILED MAP NO. 203-96, A DISTANCE OF 15.38 FEET TO A CONCRETE MONUMENT BEING THE SOUTHERLY CORNER OF SAID LOT NO. 15, THE NORTHEASTERLY CORNER OF LANDS HEREIN DESCRIBED AND LYING ON THE WESTERLY LINE OF COUNTY HIGHWAY NO. 63 (A.K.A BLUMEL ROAD); THENCE RUNNING ALONG THE WESTERLY LINE OF SAID BLUMEL ROAD BEING THE EASTERLY LINE OF LANDS HEREIN DESCRIBED (2) SOUTH 10 DEGREES -10'-40" EAST, A DISTANCE OF 138.05 FEET TO A CONCRETE MONUMENT BEING THE SOUTHEASTERLY CORNER OF LANDS HEREIN DESCRIBED AND THE NORTHEASTERLY CORNER OF LOT NO. 17 AS SHOWN ON THE PREVIOUSLY MENTIONED MAP; THENCE RUNNING ALONG THE NORTHERLY LINE OF SAID LOT NO. 17, BEING THE SOUTHERLY LINE OF LANDS HEREIN DESCRIBED (3) SOUTH 83 DEGREES -52'-00" WEST, A DISTANCE OF 139.87 FEET TO A POINT BEING THE NORTHWESTERLY CORNER OF SAID LOT NO. 17, THE SOUTHWESTERLY CORNER OF LANDS HEREIN DESCRIBED AND LYING ON THE EASTERLY LINE OF SHARON DRIVE; THENCE RUNNING ALONG THE EASTERLY LINE OF SAID SHARON DRIVE BEING THE WESTERLY LINE OF LANDS HEREIN DESCRIBED ON THE FOLLOWING TWO (2) COURSES AND DISTANCE: (4) NORTH 06 DEGREES -29'-20" WEST, A DISTANCE OF 30.99 FEET TO A POINT OF CURVATURE; AND (5) ON A CURVE TO THE LEFT HAVING A RADIUS OF 135.00 FEET, AN ARC LENGTH OF 47.54 FEET, AS DEFINED BY THE CHORD NORTH 16 DEGREES -34'-35" WEST, 47.29 FEET TO THE POINT OR PLACE OF BEGINNING; ALL AS SHOWN ON A SURVEY MAP ENTITLED "PLOT PLAN, LOT NO. 16, SHERMAN ESTATES, TOWN OF WALLKILL, ORANGE COUNTY, NEW YORK", DATED SEPTEMBER 3, 1998, LAST REVISED DECEMBER 29, 1999, PREPARED BY LANE AND TULLY ENGINEERING AND SURVEYING, P.C. CONTAINING 0.346+ ACRES.

Tax Parcel No: SEC 102 BLK 1 LOT 15
This Modification Agreement modifies the following document:

1. Mortgage dated 11-06-2006, recorded 2-15-2007, in Book 12366, Page 1669, of Section 102, Block 1, and Lot 15, in the original principal balance of $228,567.67 between NICOLE D WATSON and TOMMY WATSON and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR CENTURY 21 MORTGAGE upon which, a mortgage tax of $2,370.30 was paid.

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

JPMC MODIFIED LOAN MODIFICATION AGREEMENT -- Single Family -- Fannie Mae  UNIFORM INSTRUMENT   ver.
06_12_2013_11_01_56                    1/01 (rev. 01/09)                             (page 2 of 10 pages)

1. As of AUGUST 01, 2013, the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. $313,561.67 consisting of the unpaid amount(s) loaned to the Borrower by the Lender plus any interest and other amounts capitalized.

2. The Borrower agrees to pay the Unpaid Principal Balance in the amount of $313,561.67, plus interest, to the order of the Lender. Interest at the rate of 2.000% will begin to accrue on the Unpaid Principal Balance as of JULY 01, 2013 and the first new monthly payment on the Unpaid Principal Balance will be due on AUGUST 01, 2013. The new Maturity Date will be JUNE 01, 2039. The Borrower's payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Payment Begins on | Number of Monthly Payments |
|---|---|---|---|---|---|
| 1-5 | 2.000% | 07/01/2013 | $1,292.83 | 08/01/2013 | 60 |
| 6 | 3.000% | 07/01/2018 | $1,422.73 | 08/01/2018 | 12 |
| 7-25 | 3.875% | 07/01/2019 | $1,537.26 | 08/01/2019 | 239 |

3. If all or any part of the Property or any interest in the Property is sold or transferred (or if the Borrower is not a natural person and a beneficial interest in the Borrower is sold or transferred) without the Lender's prior written consent, the Lender may require immediate payment in full of all sums secured by the Security Instrument.

   If the Lender exercises this option, the Lender shall give the Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by the Security Instrument. If the Borrower fails to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on the Borrower.

4. The Borrower understands and agrees that:

   (a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

   (b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, or by the United States Bankruptcy Code, and none of the Borrower's obligations or liabilities under the Note and

JPMC MODIFIED LOAN MODIFICATION AGREEMENT – Single Family – Fannie Mae UNIFORM INSTRUMENT    ver.
06_12_2013_11_01_56           1/01 (rev. 01/09)                  (page 3 of 10 pages)

Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of the Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which the Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by the Lender.

(c) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d) The Borrower shall not be charged for any costs and expenses incurred by the Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees.

(e) The Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by the Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

(f) That, if the Borrower is in bankruptcy upon execution of this document, the Borrower will cooperate fully with the Lender in obtaining any required bankruptcy court and trustee approvals in accordance with local court rules and procedures. The Borrower understands that if such approvals are not received, then the terms of this Agreement will be null and void. If this Agreement becomes null and void, the terms of the original Loan Documents shall continue in full force and effect and such terms shall not be modified by this Agreement.

5. If the Borrower previously received a chapter 7 bankruptcy discharge but did not reaffirm under applicable law amounts due under the Note:

   (a) Notwithstanding anything to the contrary contained in this Agreement, the Borrower and the Lender acknowledge the effect of any such discharge in bankruptcy granted to the Borrower prior to the execution of this Agreement,
   (b) The Lender may not pursue the Borrower for personal liability. However, the Borrower acknowledges that the Lender retains certain rights, including but not limited to, the right to foreclose its lien evidenced by the Security Instrument under appropriate circumstances.
   (c) The parties agree that the consideration for this Agreement is the Lender's forbearance from presently exercising its rights and pursuing its remedies under the Security Instrument as a result of the Borrower's default thereunder.
   (d) Nothing in this Agreement shall be construed to be an attempt to collect against the Borrower personally or an attempt to revive personal liability.

6. The Borrower hereby absolutely and unconditionally assigns and transfer to the Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon this assignment, the Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in the Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold estate.

The Borrower hereby absolutely and unconditionally assigns and transfers to the Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are

payable. The Borrower authorizes the Lender or the Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to the Lender or the Lender's agents. However, the Borrower shall receive the Rents until (i) the Lender has given the Borrower notice of default under this Agreement, pursuant to Section 22 of the Security Instrument, and (ii) the Lender has given notice to the tenant(s) that the Rents are to be paid to the Lender or the Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If the Lender gives notice of default to the Borrower: (i) all Rents received by the Borrower shall be held by the Borrower as trustee for the benefit of the Lender only, to be applied to the sums secured by the Security Instrument; (ii) the Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) the Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to the Lender or the Lender's agents upon the Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by the Lender or the Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) the Lender, the Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) the Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by the Lender for such purposes shall become indebtedness of the Borrower to the Lender secured by the Security Instrument pursuant to Section 9 of the Security Instrument.

The Borrower represents and warrants that the Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent the Lender from exercising its rights under this paragraph.

The Lender, or the Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to the Borrower. However, the Lender, or the Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of the Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

7. By this paragraph, the Lender is notifying the Borrower that any prior waiver by the Lender of the Borrower's obligation to pay to the Lender Funds for any or all Escrow Items is hereby revoked, and the Borrower has been advised of the amount needed to fully fund the Escrow Items.

8. If the original loan documents did not include standard provisions for escrow items, the Borrower will pay to the Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the

Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by the Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to the Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that the Lender requires to be escrowed. These items are called "Escrow Items." The Borrower shall promptly furnish to the Lender all notices of amounts to be paid under this paragraph. The Borrower shall pay the Lender the Funds for Escrow Items unless the Lender waives the Borrower's obligation to pay the Funds for any or all Escrow Items. The Lender may waive the Borrower's obligation to pay to the Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, the Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by the Lender and, if the Lender requires, shall furnish to the Lender receipts evidencing such payment within such time period as the Lender may require. The Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If the Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and the Borrower fails to pay the amount due for an Escrow Item, the Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and the Borrower shall then be obligated to repay to the Lender any such amount. The Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, the Borrower shall pay to the Lender all Funds, and in such amounts, that are then required under this paragraph.

The Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit the Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. The Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including the Lender, if the Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. The Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. The Lender shall not charge the Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless the Lender pays the Borrower interest on the Funds and applicable law permits the Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, the Lender shall not be required to pay the Borrower any interest or earnings on the Funds. The Lender and the Borrower can agree in writing, however, that interest shall be paid on the Funds. The Lender shall provide the Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, the Lender shall account to the Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, the Lender shall notify the Borrower as required by RESPA, and the Borrower shall pay to the Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of

Funds held in escrow, as defined under RESPA, the Lender shall notify the Borrower as required by RESPA, and the Borrower shall pay to the Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, the Lender shall promptly refund to the Borrower any Funds held by the Lender.

(SIGNATURES CONTINUE ON FOLLOWING PAGES)

**TO BE SIGNED BY BORROWER ONLY**

BORROWER SIGNATURE PAGE TO MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, N.A. And NICOLE D WATSON AND TOMMY WATSON, LOAN NUMBER 1916747081 WITH A MODIFICATION EFFECTIVE DATE OF August 01, 2013

In Witness Whereof, the Borrower(s) have executed this agreement.

_____ Date: 6/24/13
Borrower - NICOLE D WATSON

_____ Date: 6/26/13
Borrower - TOMMY WATSON

State of NEW YORK )
                  ) ss.:
County of Orange  )

On the 26th day of June, in the year 2013, before me, the undersigned, a Notary Public in and for said State, personally appeared **NICOLE D WATSON and TOMMY WATSON**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(Signature and office of person taking acknowledgment)
DIANE C. GENENDER

(Seal, if any)

My Commission Expires: 4/2/16

NOTARY PUBLIC-STATE OF NEW YORK
No. 01GE6258981
Qualified in Orange County
My Commission Expires April 02, 20 16

JPMC MODIFIED LOAN MODIFICATION AGREEMENT – Single Family – Fannie Mae UNIFORM INSTRUMENT ver.
06_12_2013_11_01_56        1/01 (rev. 01/09)        (page 8 of 10 pages)